<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JAMES SCOTT,

     Plaintiff,       Civil Action No. 01-4171(SDW)

  v.

BOARD OF EDUCATION OF THE
CITY OF EAST ORANGE, EVERETT
JENNINGS, and ROBERT BOWSER,      **OPINION**

      Defendants.    December 12, 2006

**WIGENTON, District Judge**

   This matter comes before the Court upon Motions for Summary Judgment by Defendants Board of Education of the City of East Orange (the "Board") and Everett Jennings ("Jennings") (collectively, "Defendants") pursuant to Fed. R. Civ. P. 56 and by the Board for Sanctions and Counsel Fees pursuant to Fed. R. Civ. P. 11.  The Court, having considered the parties' submissions and having decided these matters without oral argument pursuant to Fed. R. Civ. P. 78, and for the reasons discussed below, grants in part and denies in part the Board's Motion for Summary Judgment, grants Jennings' Motion for Summary Judgment and denies the Board's Motion for Sanctions and Counsel Fees.

**I.  PROCEDURAL HISTORY**

   On August 31, 2001, Plaintiff James Scott ("Plaintiff") commenced this civil action. Plaintiff's five-count Complaint alleged the following: constitutional violations including right to free expression, political association, substantive and procedural due process, privacy and equal protection, contrary to 42 U.S.C. § 1983 (Count One); violations of the Conscientious Employee

Protection Act ("CEPA"), contrary to N.J.S.A. 34:19-1, et seq. (Count Two); violations of the New Jersey Law Against Discrimination Act, contrary to N.J.S.A. 10:5-1, et seq. (Count Three); defamation (Count Four); and conversion (Count Five).   In his opposition to Defendants' Motions for Summary Judgment, Plaintiff voluntarily dismissed a majority of the claims he originally asserted.   The parties agree that the remaining claims for summary judgment consideration are a 42 U.S.C. § 1983 claim for violation of Plaintiff's First Amendment right to free expression (portion of Count One); a CEPA violation claim (Count Two); and a conversion claim (Count Five).

## II.    FACTS

### A.    Plaintiff's Failure to Comply with Local Civil Rule 56.1

"On motions for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue."  L. Civ. R. 56.1. Uncontested facts are deemed admitted.  2005 U.S. Dist. LEXIS 18079, *25-26 (citing White v. Camden City Board of Education, 251 F. Supp. 2d 1242, 1246 n. 1 (D.N.J. 2003) (deeming admitted facts stated in defendant's statement of facts and uncontested by plaintiff); Hill v. Algor, 85 F. Supp. 2d 391, 408 n. 26 (D.N.J. 2000) (same).

Defendants have complied with Rule 56.1 as they have each attached to their Motions for Summary Judgment a Statement of Undisputed Material Facts.  Plaintiff has failed to comply with Rule 56.1 because he failed to submit a statement of undisputed material facts.  The Board raised this issue in its Reply Brief and Reply to Plaintiff's Statement of Facts concluding that the facts presented in the Board's Statement of Undisputed Material Facts remain undisputed.  In response, Plaintiff offered the following:

> I am in receipt of Defendants' Reply to Plaintiff James Scott's Opposition to the Motion for Summary Judgment.  In the Reply Brief,

> the Board indicated that their Statement of Undisputed Facts was
> uncontested.   To the contrary, plaintiff included a Statement of
> Material Facts in his Brief.    To say the least, Defendant's
> conclusionary and self-serving statements are not undisputed.

(Shaffer, Esq. Letter dated January 24, 2006.)  The Statement of Facts - not Statement of Material

Facts as Plaintiff stated - filed by Plaintiff as part of his Opposition Brief consists of 25 unnumbered

paragraphs and includes unsupported statements.

　　　　As a result, on November 2, 2006, the Court requested that Plaintiff's counsel provide

citations to the record for specific statements provided in the Statement of Facts.  Plaintiff's counsel

agreed to provide the Court with answers on November 6, 2006.  The Court did not hear from

counsel until November 14, 2006.  On that date, Plaintiff's counsel faxed to the Court supplemental

information, which clarified and corrected statements made in the Statement of Facts.

　　　　The Court will adjudicate the Motions for Summary Judgment and deem admitted

uncontested facts.

### B.　　Material Facts

**1.　　The following facts are material to the Motions for Summary Judgment and
Motion for Sanctions and provided by Defendants in their Local Civil Rule 56.1 Statements
of Undisputed Material Facts.**

　　　　Plaintiff commenced employment with the Board in July 1995 (Board's 56.1 Statement ¶ 1)

as HVAC Foreman (Board's 56.1 Statement ¶ 2; Jennings' 56.1 Statement ¶ 1).  In 1997, Plaintiff

was transferred to HVAC Supervisor.  (Board's 56.1 Statement ¶ 2; Jennings' 56.1 Statement ¶ 1.)

During the course of his employment, Plaintiff was employed pursuant to a series of one year

contracts, which were terminable - without cause - by either party upon sixty days notice.  (Board's

56.1 Statement ¶¶ 4 and 6; Jennings' 56.1 Statement ¶¶ 2 and 4.)  At the time of his termination,

Plaintiff was employed under a contract for the period from July 1, 2000 through June 30, 2001.

(Board's 56.1 Statement ¶ 5; Jennings' 56.1 Statement ¶ 3.)

The Board maintains a policy that requires requests for purchases of materials, supplies and services to be made through a signed and approved purchase order. (Board's 56.1 Statement ¶ 11.) Throughout his employment, Plaintiff was aware of the Board's policy on purchasing procedures and the requirements for obtaining purchase orders before obtaining any materials, supplies or services on behalf of the Board. (Board's 56.1 Statement ¶ 12.) Mark S. Kramer ("Kramer"), School Business Administrator/Board Secretary, trained Plaintiff on the Board's purchasing policies and procedures. (Board's 56.1 Statement ¶ 13.) Plaintiff failed to comply with the Board's purchasing policies and procedures on numerous occasions throughout his employment. (Board's 56.1 Statement ¶ 14.)

By memorandum dated April 8, 1999, Dr. Robert Penna, Executive Director, advised Plaintiff that he could not change items contained within a purchase order and if a purchase order needed to be altered, the purchase order must be rewritten. (Board's 56.1 Statement ¶ 15; Jennings' 56.1 Statement ¶ 8.) Plaintiff attended several meetings with Kramer during which Plaintiff was reprimanded for failing to follow the Board's purchasing policies and procedures. (Board's 56.1 Statement ¶ 16.)

By memorandum dated April 3, 2000, Kenneth D. King, Assistant Superintendent for Personnel, advised Plaintiff that he had no right to contact a Board member and discuss a pending personnel matter. (Board's 56.1 Statement ¶ 17; Jennings' 56.1 Statement ¶ 9.) King told Plaintiff his behavior was "professionally inappropriate." (Board's 56.1 Statement ¶ 17; Jennings' 56.1 Statement ¶ 9.) In said memorandum, King also stated that he was "extremely dissatisfied" with Plaintiff's "behavior and performance" and advised that Plaintiff should consider the memorandum

-4-

to be a formal written reprimand.  (Board's 56.1 Statement ¶ 18; Jennings' 56.1 Statement ¶ 10.)

The Board maintains a policy pursuant to which requests for the purchase of materials, supplies and services be made through a signed and approved purchase order.  (Jennings' 56.1 Statement ¶ 11.)

By letter dated September 2, 2000, Kramer advised Plaintiff that issues relating to his employment status would be discussed at the September 5, 2000 Board meeting.  (Board's 56.1 Statement ¶ 19; Jennings' 56.1 Statement ¶ 12.)  Said letter indicated that the Board's discussion of Plaintiff's employment status would take place in an executive (closed) session unless Plaintiff notified Board Secretary, Kramer, that Plaintiff desired to have the discussion take place in an open session.  (Board's 56.1 Statement ¶ 20; Jennings' 56.1 Statement ¶ 13.)

At the September 5, 2000 Board meeting, upon the recommendation of Dr. Oval Totdahl ("Totdahl"), Interim Superintendent of Schools, Plaintiff was suspended with pay by the Board pending further investigation.  (Board's 56.1 Statement ¶ 21; Jennings' 56.1 Statement ¶ 14.)  The Board suspended Plaintiff because he allegedly engaged in improper conduct, which, if true, cast doubt upon his ability to execute properly his duties.  (Board's 56.1 Statement ¶ 22; Jennings' 56.1 Statement ¶ 15.)  Jennings was absent from the September 5, 2000 Board meeting.  (Jennings' 56.1 Statement ¶ 16.)  Melvin Randall, Esq., the Board's attorney, recommended that Plaintiff be suspended.  (Jennings' 56.1 Statement ¶ 17.)

Subsequently, the Board passed resolutions by which it remitted payments to Jersey Power Equipment and Crosstown Plumbing Supply for goods/services acquired by Plaintiff on behalf of the Board without having first secured a purchase order pursuant to Board policy.  (Board's 56.1 Statement ¶¶ 39-40.)

By letter dated November 17, 2000, Kramer notified Plaintiff that issues relating to his employment status would be discussed at the November 21, 2000 Board meeting.  (Board's 56.1 Statement ¶ 41; Jennings' 56.1 Statement ¶ 31.)  Discussion of Plaintiff's employment status was postponed to the December 19, 2000 Board meeting, at which time, the Board passed a resolution terminating Plaintiff's employment based upon the recommendation of Totdahl.  (Board's 56.1 Statement ¶ 42; Jennings' 56.1 Statement ¶ 32.)  Plaintiff appeared, through his counsel, before the Board at a hearing to discuss his suspension from, and termination of, his employment.  (Board's 56.1 Statement ¶ 43.)  Jennings failed to recall how he voted regarding Plaintiff's termination, but he testified that the Board's counsel recommended that Plaintiff be suspended.  (Jennings' 56.1 Statement ¶ 33.)  Jennings is one of six members of the Board.  (Jennings' 56.1 Statement ¶ 34.)  Jennings followed the advice given by the Board's counsel regarding issues relating to Plaintiff's malfeasance.  (Jennings' 56.1 Statement ¶ 35.)  The Board's counsel recommended that Plaintiff's employment with the Board be terminated.  (Jennings' 56.1 Statement ¶ 36.)

Effective February 20, 2001, the Board terminated Plaintiff's employment for a pattern of violating the Board's policies and procedures for the purchase of supplies, materials and equipment.  (Board's 56.1 Statement ¶ 44.)  Plaintiff admits that when suspending and terminating his employment, the Board did not treat him differently because of his race.  (Board's 56.1 Statement ¶ 45.)

At no time during Jennings' service with the Board did he believe that any action on his part violated the rights of any person.  (Jennings' 56.1 Statement ¶ 39.)  Jennings stated that at all times during his service with the Board, he acted in good faith and with no intention of violating the law or any person's rights.  (Jennings' 56.1 Statement ¶ 40.)

By letter dated February 11, 2002, the Board's counsel requested that Plaintiff identify the items he "believe[d] are to be his which were found in his office." (Board's 56.1 Statement ¶ 46; Jennings' 56.1 Statement ¶ 41.) By letter dated February 11, 2002, Plaintiff's counsel sent a letter to the Board's counsel confirming a telephone conversation in which the Board's counsel acknowledged that the Board had "certain personal items of Mr. Scott that were being stored within his office at the time of his termination." (Board's 56.1 Statement ¶ 47; Jennings' 56.1 Statement ¶ 42.)

By letter dated February 12, 2002, the Board's counsel wrote to Plaintiff's counsel acknowledging "receipt of Mr. Scott's list of the items which he claims were left behind in his office." (Board's 56.1 Statement ¶ 48; Jennings' 56.1 Statement ¶ 43.) In said letter, the Board's counsel stated that the Board would return Plaintiff's personal belongings after separating them from the Board's property. (Jennings' 56.1 Statement ¶ 44.) By letter dated April 5, 2002, the Board's counsel provided to Plaintiff's counsel a list of the personal items found in Plaintiff's office and invited Plaintiff to arrange for procurement of such items. (Board's 56.1 Statement ¶ 49; Jennings' 56.1 Statement ¶ 45.) Neither Plaintiff nor his counsel responded to the April 5, 2002 letter. (Board's 56.1 Statement ¶ 50.)

Seventeen months later, by letter dated September 26, 2003, Plaintiff's counsel alleged that "Mr. Scott's personal property is still being held by Defendants." (Board's 56.1 Statement ¶ 51; Jennings' 56.1 Statement ¶ 46.) By letter dated October 1, 2003, the Board's counsel responded to said letter by explaining efforts made to contact him regarding Plaintiff's personal items and Plaintiff's counsel's failure to respond to same. (Board's 56.1 Statement ¶ 52; Jennings' 56.1 Statement ¶ 48.) Said letter included the "letter of April 5, 2002, delineating the personal items

which, at that time, were in the Board's possession." (Jennings' 56.1 Statement ¶ 47.) The Board's counsel requested that "plaintiff dismiss [the conversion] count of his Complaint." (Jennings' 56.1 Statement ¶ 48.)

By letter dated October 17, 2003, the Board's counsel informed Plaintiff's counsel that "Mr. Scott's [personal] items he alleges to have been converted by the Board are available for pick up at my office." (Board's 56.1 Statement ¶ 53; Jennings' 56.1 Statement ¶ 49.) By letter dated November 3, 2003, the Board's counsel confirmed with Plaintiff's counsel his consent for the Board's counsel to contact Plaintiff directly regarding arrangements to retrieve his personal items. (Board's 56.1 Statement ¶ 54; Jennings' 56.1 Statement ¶ 50.)

In another letter dated November 3, 2003, the Board's counsel requested that Plaintiff dismiss the conversion count contained in the Complaint, as he had taken no action to recoup his personal items. (Board's 56.1 Statement ¶ 55; Jennings' 56.1 Statement ¶ 51.)

On November 7, 2003, Plaintiff retrieved his personal items from the Board's counsel's law office. (Board's 56.1 Statement ¶ 56; Jennings' 56.1 Statement ¶ 52.) On that date, Plaintiff executed an Acknowledgment of Receipt of Personal Items. (Board's 56.1 Statement ¶ 57.)

Plaintiff's potential damages in this case are limited to wages and benefits earned before June 29, 2001. (Board's 56.1 Statement ¶ 60.) Plaintiff is not entitled to front-end pay or reinstatement. (Board's 56.1 Statement ¶ 61.) Plaintiff's compensatory damages in this case are limited to $27,046.67. (Board's 56.1 Statement ¶ 62.)

**2.      The following facts are material to the Motions for Summary Judgment and Motion for Sanctions and provided by Plaintiff in the Statement of Facts, which is part of the Brief in Opposition; in the Supplement dated November 14, 2006; and the record.**

On July 6, 1995, Plaintiff was hired as a Foreman for the HVAC Department. (Opp'n Br.

5.)  Plaintiff was promoted to HVAC Supervisor on May 11, 1997.  (Opp'n Br. 5.)

In 1998, New Jersey decided that six schools within the district were to switch their method of heating from oil to gas.  (Opp'n Br. 5.)  According to Kramer, pursuant to the Board's policy, certain contractors were required to submit bids to prepare the specifications for the oil to gas project (the "Project").  (Opp'n Br. 5.)  Plaintiff was responsible for securing these bids.  (Opp'n Br. 5.)

In 2000, the Board had an official policy with regard to obtaining bids for professional services such as the engineering specifications for the Project.  (Opp'n Br. 5; Plaintiff's November 14, 2006 Supplement 1.)  The Board's policy was delineated in the Purchasing Manual.  (Opp'n Br. 5; Plaintiff's November 14, 2006 Supplement 1.)  The Purchasing Manual stated, "[i]f proposals are to be obtained, they are to be sealed proposals and may be scheduled to be opened publicly by the Purchasing Office.  This scheduling, together with the text of the solicitation for proposals, is to be reviewed with the Purchasing Office."  (Opp'n Br. 6.)  The Purchasing Manual adopts N.J.S.A. 18A:18A and is intended to assist the Board employees in the proper purchasing practices.  (Opp'n Br. Ex. D.)

When an estimate for professional services is over $12,900, the Purchasing Manual mandates that the bidding procedure be followed.  (Opp'n Br. 6.)  The Purchasing Manual states, "[i]f you plan to recommend the hiring of a professional consultant, be advised of the following: . . . [w]hen estimate is $12,900 or greater, bidding procedure must be followed."  (Opp'n Br. 6.)

In compliance with the Purchasing Manual, Plaintiff obtained three engineering proposals for the Project because the cost was expected to exceed the $12,900 threshold amount.  (Opp'n Br. 7.)  In compliance with the Purchasing Manual, these three proposals were sealed.  (Opp'n Br. 7.)  Plaintiff presented the proposals to the Board and recommended that LJM Engineers ("LJM") be

awarded the Project because it submitted the lowest qualified proposal (i.e., $86,750).  (Opp'n Br. 7; Plaintiff's Memorandum dated July 13, 2000.)  On April 10, 2000, the Board rejected all three proposals, including LJM's.  (Opp'n Br. 7.)

Plaintiff stated that pursuant to Jennings' instructions, Plaintiff contacted Luis Aguero ("Aguero"), President of Technical Associates, regarding the Project.  (Cert. of S. Schwartz, Esq., the Board's counsel, Ex. 18.)  Before Technical Associates provided a proposal for the Project, Plaintiff provided a redacted version of one of the three contractor's proposals for the Project to Aguero.  (Opp'n Br. 8; Plaintiff's November 14, 2006 Submission 2-3.)

On June 20, 2000, Technical Associates provided a quote for $90,100 for the Project.  (Opp'n Br. 8.)  Although this quote was higher than that submitted by LJM, Technical Associates was hired to work on the Project.  (Opp'n Br. 8.)

Plaintiff was concerned about the propriety of Technical Associates securing work on the Project.  (Opp'n Br. 8.)  By memorandum dated July 7, 2000, Plaintiff told Kramer that Jennings instructed him to contact Technical Associates and described his meeting with representatives from Technical Associates.  (Opp'n Br. Ex. M.)  Specifically, Plaintiff stated:

> As we rode through the community to visit the schools identified for this project, Mr. Louis Aquerro from Technical Associates commented to me that, "You know we are here because of the politics involving this contract.  Mayor Bowser and Everett Jennings discussed the contract with us and asked us to follow up with your office to secure the contract."  At this time I made no comment regarding Mr. Aquerro's statement.  However, I became very disturbed because of the continued involvement of Mr. Jennings, and now Mayor Bowser, in potential contracts in the district, particularly those contracts affecting my area of responsibility.  I further discussed with the two representatives of Technical Associates that the lowest quote would be give [sic] to the Board for its review.  The [sic] indicated that they would follow up by contacting my office for a status update.

-10-

> I am sending you this memorandum due to the fact of the potential exposure of contract law violation on the part of Mr. Jennings and Mayor Bowser, as they are increasingly becoming involved in Board business.  Please refer to other memos regarding this issue of Mr. Jennings' involving himself in construction and reconstruction contracts in the district.

(Opp'n Br. Ex. M.)

Aguero described his relationship with Jennings as good.  (Plaintiff's November 14, 2006 Submission 2.)  Aguero stated that on one occasion, he and Jennings submitted a work proposal together, which was not accepted by the Board.  (Plaintiff's November 14, 2006 Submission 2.)

By memorandum dated July 13, 2000, Plaintiff explained to his supervisor, Joy DeVincenzi ("DeVincenzi"), what had occurred concerning the Board's rejection of the lowest proposal for work on the Project.  (Opp'n Br. 9.)  Plaintiff noted that Jennings asked him to solicit another vendor because the lowest bidder was not a minority.  (Opp'n Br. 9.)

Kramer stated that it would have been improper for Jennings to have instructed Plaintiff to contact Technical Associates, yet Kramer did not investigate Plaintiff's allegations against Jennings. (Opp'n Br. Ex. C.)

In July 2000, the Board had a meeting and Plaintiff refused to place on the agenda the proposal from Technical Associates because he believed it did not conform to the Board's procedure. (Opp'n Br. 10.)  On September 5, 2000, the Board suspended the Plaintiff's employment and terminated his employment on January 23, 2001.  (Opp'n Br. 10.)  The Board terminated Plaintiff's employment because he engaged "in a pattern of violating the Districts [sic] policies and procedures for the purchase of supplies, materials and equipment."  (Opp'n Br. Ex. O.)

Plaintiff denied that he violated any Board policies and believed the "reason" for termination was a pretext for his refusal to recommend Technical Associates for the Project.  (Opp'n Br. 10.)

Kramer stated that prior to 2000, he was aware of no instance where an employee was terminated for making confirming orders.  (Opp'n Br. Ex. C.)  Kramer stated that confirming orders are made "[a]t the East Orange Board of Ed, a few times a week."  (Opp'n Br. Ex. C.)

In 2000, the Board followed a particular process to discipline employees for failing to secure authorization prior to making purchases on behalf of the Board.  To wit, a first offense was punishable by a business administrator's memorandum and meeting and a second offense was punishable by a superintendent's memorandum and meeting.  (Opp'n Br. Ex. C.)  Kramer provided information regarding confirming orders made by Plaintiff after Plaintiff was suspended.  (Opp'n Br. Ex. C.)  Kramer stated that the Board failed to follow its policy and procedure when it discovered that Plaintiff made unauthorized purchases.  (Opp'n Br. Ex. C.)

Thirty other employees have been formally reprimanded - but not terminated - for making unauthorized purchases on behalf of the Board.  (Opp'n Br. 12.)  To wit, Deloris Trimble, Director of Special Education Services, has received 113 reprimands for making unauthorized purchases totaling $1,430,270.20.  (Opp'n Br., P.)  She still is employed with the Board.  (Opp'n Br. 12.)  Nicholas Del Tufo, Principal, has received 4 reprimands for making unauthorized purchases totaling $41,822.82, but his employment was not terminated by the Board for such purchases.  (Opp'n Br. Ex. P.)  JoAnn St. Jacques, Administrative Assistant, has received 7 reprimands for making unauthorized purchases totaling $47,591.99, but her employment was not terminated by the Board for making such purchases.  (Opp'n Br. Ex. P.)

## III.   DISCUSSION

### A.   Jurisdiction

This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367.

**B.      Summary Judgment Standard**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party meets its initial burden, the burden then shifts to the non-movant who "may not rest upon the mere allegations or denials of [its] pleading, but the [non-movant's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "If the [non-movant] does not so respond, summary judgment, if appropriate, shall be entered against the [non-movant]." Fed. R. Civ. P. 56(e).  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001) (include parenthetical).

The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact.  Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

**C.      42 U.S.C. § 1983**

Section 1983 of Title 42 of the United States Code subjects to liability:

> [e]very person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory or the District of Colombia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983.  To establish a viable § 1983 claim, a plaintiff must demonstrate that "the conduct complained of was committed by a person acting under color of state law" and that "this conduct deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993) (quoting Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)).

To establish that a defendant acted under color of state law, a plaintiff must demonstrate that the defendant "exercised power 'possessed by virtue of state law and made possible only because the [defendant] is clothed with the authority of state law.'" Barna v. City of Perth Amboy, 42 F.3d 809, 815-16 (3d Cir. 1994) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).  A defendant is "a state actor when (1) he is a state official, (2) "he has acted together with or has obtained significant aid from state officials," or (3) his conduct is, by its nature, chargeable to the state." Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 277 (3d Cir. 1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

To establish that a defendant violated a right secured by the Constitution or laws of the United States, a plaintiff must demonstrate that the defendant deprived it of such right as charged in the complaint.  Salerno v. O'Rourke, 555 F. Supp. 750, 757 (D.N.J. 1983).  A plaintiff must "identify the exact contours of the underlying right said to have been violated." Downey v. The Coalition Against Rape and Abuse, Inc., 143 F. Supp. 2d 423, 437 (D.N.J. 2001) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998)).

The First Amendment of the United States Constitution protects statements made by a public employee on matters of public concern. Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 574 (1968). In other words, "[a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." Baldassare v. State of New Jersey, 250 F.3d 188, 194 (3d Cir. 2001) (citing Rankin v. McPherson, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.") (Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 829 (3d Cir. 1994) ("A state cannot lawfully discharge an employee for reasons that infringe upon that employee's constitutionally protected interest in freedom of speech.")).

That being said, a public employer has the right to exercise some control over its workforce and has an interest in efficiently providing public service through its employees without disruption. Brennan, 350 F.3d at 412-13. Thus, courts analyze three factors to determine whether a public employee has engaged in protected speech. Baldassare, 250 F.3d at 194-95.

First, the speech "must involve a matter of public concern." Brennan 350 F.3d at 412 (quoting Connick v. Myers, 461 U.S. 138 (1983)). This means that the speech must have a political, social or other value to the public. Baldassare, 250 F.3d at 195. Speech that is purely personal, such as that involving a personal grievance, does not qualify and will not be afforded constitutional protection. Brennan, 350 F.3d at 412; citing Connick v. Myers, 461 U.S. 138 (1983). However, when speech concerns the speaker and public, it can qualify for constitutional protection. Brennan, 350 F.3d at 412-13 (citing Rankin v. McPherson, 483 U.S. 378, 387 n. 11 (1987)). Thus, a speaker's motivation in making a statement while relevant, is not dispositive in determining whether his speech concerns a matter of public concern. Brennan, 350 F.3d at 413 (citing Azzaro, 110 F.3d at

-15-

973).   Courts have held that speech concerning malfeasance or breach of public trust by state government officials qualify as matters of public concern.  Brennan, 350 F.3d at 412 (citing Connick 461 U.S. at 148).  To determine whether speech involves a matter of public concern, courts examine "the content, form, and context" of the speech.  Baldassare, 250 F.3d at 195.  "Determining whether a public employee's speech is a matter of public concern is a question of law for the court."  Baldassare, 250 F.3d at 195.

If plaintiff establishes that his speech involves a matter of public concern, "plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees."  Baldassare, 250 F.3d at 195 (citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968) (requiring courts to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."))  Like the first inquiry, this inquiry is one of law for the court.  Baldassare, 250 F.3d at 195 (citing Waters, 511 U.S. at 668, Green, 105 F.3d at 885).

> On the one side, we weigh the public employee's interest in speaking about a matter of public concern and the value to the community of [him/]her being free to speak on such matters.  Balanced against these interests is the government's interest as an employer in promoting the efficiency of the services it performs through its employees.  Only if the value of the speech, as measured by the employee's and the public's interests, is outweighed by the government's interest in effective and efficient provision of services, will [a court] hold that the speech is protected.

Brennan, 350 F.3d at 413 (internal quotations and citations omitted).

As such, courts examine the relationship between the public employee and his state government employer and the disruption the employee's speech may have caused particularly on the employer's ability to maintain discipline and relationships in the workplace.  Baldassare, 250 F.3d

at 198.  A public employee will not be penalized simply because his speech disrupted the workplace.

Baldassare, 250 F.3d at 200.  Rather, disruption of the workplace is a factor considered in balancing

the employee's interest against the interests of the state government.  Baldassare, 250 F.3d at 200.

If a public employee's speech involves a public concern and the balance of harm weighs in

favor of the employee's expression, "plaintiff must then show the protected activity was a substantial

or motivating factor in the alleged retaliatory action."  Baldassare, 250 F.3d at 195.  However, a

public employee will not prevail if his employer establishes that it would have reached the same

adverse employment decision in the absence of the protected speech.  Baldassare, 250 F.3d at 195.

This third step in the analysis "raises an issue of fact that must be resolved by the fact finder."

Brennan, 350 F.3d at 414 (citing Baldassare, 250 F.3d at 195).  Thus, in deciding whether to grant

summary judgment, the court must determine "whether the record supports a finding that the

expression caused any of the defendants to retaliate against [the plaintiff] for that expression."

Brennan, 350 F.3d at 414.

In Watters v. City of Philadelphia, 55 F.3d 886 (3d Cir. 1995), the Court of Appeals for the

Third Circuit held that statements made by an employee of the police department, regarding the

police department employee assistance program, were protected by the First Amendment.  In that

case, Plaintiff was the manager of the program and terminated from employment when he criticized

the program for lacking formal policies.  The Court held that plaintiff's right to freedom of speech

regarding a matter of public concern, [i.e., learning about problems which may have impaired the

effective functioning of the employee assistance program, which could have affected delivery of

police services] outweighed the police department's significant interest in regulating speech to

protect public safety.

Likewise, in Feldman v. Philadelphia Housing Authority, 43 F.3d 823 (3d Cir. 1994), the

Court of Appeals for the Third Circuit held that statements made by defendant's employee, which served to disclose improprieties in the Housing Authority, were protected under the First Amendment. "Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concern." Feldman, 43 F.3d at 829.

The Supreme Court held "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 574 (1968). In that case, a teacher was terminated from employment for writing a letter to the local newspaper in which he criticized the Board's handling of bond issue proposals, the Board's allocation of financial resources between the educational and athletic programs, and the Superintendent's methods of preventing teachers from opposing the proposed bond issue. Pickering, 391 U.S. at 567.

### 1.     Public Concern

In the matter before this Court, the statements made by Plaintiff in the July 7, 2000 Memorandum[1] and the July 13, 2000 Memorandum[2] involved matters of public concern. It appeared that Plaintiff made allegations of bid rigging so that Kramer and/or DeVincenzi could cure problems or at least investigate concerns of impropriety. The citizens of East Orange would be interested in information regarding how contracts were awarded by the Board. This would be the case particularly given that Dr. John Howard, Jr. repeatedly alleged that Jennings is "in here to get his people contracts" and a contractor recommended by Jennings secured a contract despite not submitting the

---

[1]  The Memorandum was addressed to Kramer.  Dr. John Howard, Jr. and DeVincenzi Plaintiff's supervisor, were carbon-copied on the Memorandum.

[2]  The Memorandum was addressed to DeVincenzi.

lowest estimate.  Kramer agreed that it would be "improper" for Jennings to instruct Plaintiff to meet

with third parties concerning contracts and that Plaintiff's allegations were "pretty serious."  Further,

according to Plaintiff, Aguero told him "[y]ou know we are here because of the politics involving

this contract.  Mayor Bowser and Everett Jennings discussed the contract with us and asked us to

follow up with your office to secure the contract."  The community has an interest in knowing that

contracts, particularly of this size, are awarded absent undue influence and that certain contractors

are not favored for improper purposes.  The community has an interest in exposing potential

wrongdoing.

Likewise, if the award of contracts is based upon a contractor's minority status, the

community would have an interest particularly when a seemingly qualified contractor provides the

lowest estimate but is rejected because it is not a minority entity.  The taxpayers of East Orange take

an interest in how their money is spent and want to know that the government is being efficient.  The

citizens of East Orange take an interest in promoting minority business entities.

The Purchasing Manual was consistent with N.J.S.A. § 18A:18A-5 and N.J.S.A. § 40A:11-

5(1)(a)(i) in that neither required the Board to use the bidding procedure for engineering services

estimated to be at least $12,900.  The Purchasing Manual provided:

> Exceptions to the Bid Limit
>
> New Jersey State Law allows for some exceptions to the Bid and
> Quotation limits.  There are 22 exceptions where a Board of
> Education does not have to solicit bids.  They are as follows:
>
> 1.  Professional Services - doctor, lawyer, CPA, etc.;"

(Purchasing Manual 8.)  Again, the Purchasing Manual provided, "Professional services* as defined

in Title 18A:18A-2 and 18A:18A-5a(1) do not require competitive bids or quotations."  (Purchasing

Manual 9.)  This interpretation of the Purchasing Manual is consistent with Kramer's testimony.

(Kramer Dep. 31-33, 75-77.)  The parties agree that engineering services provided for the Project are professional services.

In support of his contention that the Purchasing Manual required the Board to use the bidding procedure to hire engineering services for the Project, Plaintiff referred to the following section:

> All professional or consultant services may require a contract approved by the East Orange Board of Education.  If you plan to recommend the hiring of a professional consultant, be advised of the following:
>
> 1.  Quote and/or bid requirement must be followed when the cost of consultant exceeds $2,580
>
> a) When estimate is greater than or equal to $2,580, you must obtain three (3) quotes.  (p. 7)
>
> b) When estimate is $12,900 or greater, bidding procedure must be followed.  (p. 7)

(Purchasing Manual 10.)  A careful examination of the words used in the section, however, revealed that the Purchasing Manual distinguished between professional services, which was the sort of service provided by Technical Associates, and consultant services.  The $12,900 threshold applied to consultant services not professional services.  Hence, the Board was not required to follow the bidding procedure when it contracted for engineering services for the Project.  That being said, Plaintiff's misinterpretation of the bidding requirements under the Purchasing Manual did not detract from the public concern as provided above.  There is no evidence that Plaintiff knew that these allegations were false or that he recklessly disregarded the falsity of the statements.  See Pickering 391 U.S. at 574.

Contrary to the Board's argument that it "cannot be liable here because [the Board] acted within the parameters of Plaintiff's employment contract" in that "Plaintiff could be discharged with or without cause, provided he was given sixty (60) days advance notice," the Board would be liable

if it suspended and terminated Plaintiff for exercising his Constitutional rights. "The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Pickering, 391 U.S. at 568 (quoting Keyishian v. Board of Regents, 385 U.S. 589, 605-06 (1967).

### 2.    Balancing Test

Plaintiff has established that the community's interest in his speech (i.e., knowledge that contracts were awarded absent undue influence, the Board preferred minority entities and contracts were not awarded to the lowest bidder) outweighed the Board's countervailing interest as an employer in the effective and efficient provision of public services. The record is void of evidence and Defendants do not argue that Plaintiff's statements fostered apathy, disruption, conflict or dissension within the Board. Indeed, Kramer ignored Plaintiff's allegations.

### 3.    Retaliation

Evidence existed that supported Plaintiff's claim that he was suspended and terminated from employment in retaliation for his bid rigging statements. While the Board contended that it suspended and terminated Plaintiff because he made confirming orders, it is undisputed that other employees made confirming orders, ostensibly some more significant than Plaintiff's, and they were not suspended and/or terminated from employment. Indeed, Kramer testified that confirming orders happened "[a]t the East Orange Board of Ed, a few times a week." (Kramer Dep. at 45.) Further, Kramer stated that other employees had as many confirming orders as Plaintiff. (Kramer Dep. at 98.) The Board did not dispute that thirty other employees have been reprimanded for making confirming orders.[3]

---

[3] None of the reprimands were dated before July 23, 2002.

Further, according to Kramer, the Board failed to follow its own policies and procedures when it terminated Plaintiff rather than disciplining him and placing him on probation. (Kramer Dep. 99.)

Additionally, the proximity in time between Plaintiff's complaints and the Board's decision to suspend his employment (i.e., 2 months) creates a presumption, albeit rebuttable, that the first event triggered the next.

The chronology of events likewise creates a question for the fact finder to resolve. Kramer testified that he fielded a call from a vendor and recalled he said "now that James Scott isn't there, and you don't pay anybody without purchase orders, how am I going to get paid?" (Kramer Dep. at 95.) Ostensibly, Plaintiff was no longer there because he was suspended from employment, which happened during the September 5, 2000 Board meeting. Thus, it is circumspect that Plaintiff was suspended for making confirming orders when Kramer and, thus, the Board learned of Plaintiff's confirming orders after he was suspended. Interestingly, Kramer recalled that after September 5, 2000 someone, he could not recall who, requested that he provide information regarding Plaintiff's confirming orders. Thus, a fact finder must determine whether Plaintiff was suspended and terminated from employment in retaliation for making statements about bid rigging. The § 1983 claim against the Board is not dismissed.

The § 1983 claim against Jennings is dismissed with prejudice because he did not suspend or terminate Plaintiff from employment or take any adverse employment action against Plaintiff. Thus, Jennings could not have engaged in retaliatory conduct. The Board suspended and terminated Plaintiff, and Plaintiff made no assertion to the contrary.

### D.      Conscientious Employee Protection Act

The Conscientious Employee Protection Act, N.J.S.A. 34:19-3 provides in pertinent part:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a.  Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:

(1)  is in violation of a law, or a rule or regulation promulgated pursuant to law . . .

* * *

c.  Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1)  is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;

(2)  is fraudulent or criminal . . . ; or

(3)  is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3.  New Jersey courts have created a four-pronged test for evaluating CEPA claims.

An employee must establish that:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Caver v. City of Trenton, 420 F.3d 243, 254 (3d Cir. 2005) (citing Dzwonar v. McDevitt, 177 N.J. 451 (N.J. 2003)).

As a threshold matter, the trial court must establish the specific terms of a statute, regulation or public policy, "which would be violated if the facts as alleged are true."  Gerard v. Camden County Health Services Center, 348 N.J. Super. 516, 521-22 (App. Div. 2002) (quoting Fineman v.

-23-

New Jersey Department of Human Services., 272 N.J. Super. 606, 620 (App. Div. 1994) ("the judge must first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true.")).  To satisfy the first prong, plaintiff must establish that he objectively reasonably believed that defendant violated a statute, regulation or public policy.  Gerard, 348 N.J. Super. at 522.  Whether defendant actually violated a statute, regulation or public policy is not dispositive.  Gerard, 348 N.J. Super. at 522.  CEPA defines "whistle-blowing" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."  Caver, 420 F.3d at 255 (quoting N.J.S.A. 34:19-2(e)).  Causation is established when Plaintiff produces evidence that would permit a jury to find that it is "more likely than not" that his statutorily protected conduct . . . was a "determinative or substantial motivating factor in [employer's] decision to terminate his employment."  Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 609 (D.N.J. 2003) (quoting Donofry v. Autotote Systems, Inc., 350 N.J. Super. 276, 296 (App. Div. 2001)).  Once an employee establishes a prima facie case under CEPA, the burden shifts to the employer to establish "a legitimate, non-discriminatory reason for the adverse employment action."  Capell v. Lowe's Home Improvement of Toms River, 2005 U.S. Dist. LEXIS 22463 * 6 (citing Donofry, 350 N.J. Super. at 290-91).  Should the employer satisfy its burden, the employee must establish that the employer's reasons for the adverse employment action was a pretext for the illegal conduct.  Capell, 2005 U.S. Dist. LEXIS * 6 (citing Donofry, 350 N.J. Super. at 290-91).

### 1.     Law, Rule, Regulation or Public Policy

In the instant matter, if the facts alleged by Plaintiff are true, Defendants have violated N.J.S.A. § 18A:12-22.  That section provides:

The Legislature finds and declares:

-24-

> a.  In our representative form of government it is essential that the conduct of members of local boards of education and local school administrators hold the respect and confidence of the people.  These board members and administrators must avoid conduct which is in violation of their public trust or which creates a justifiable impression among the public that such trust is being violated.
>
> b.  To ensure and preserve public confidence, school board members and local school administrators should have the benefit of specific standards to guide their conduct and of some disciplinary mechanism to ensure the uniform maintenance of those standards among them.

N.J.S.A. § 18A:12-22.

Plaintiff reasonably believed that the Board awarded the engineering contract to Technical Associates in violation of the Purchasing Manual, which was confusing, and in violation of the public's trust and against its interest.  Plaintiff reasonably believed that Jennings and/or Mayor Robert Bowser ("Bowser") were involved in bid rigging considering the three bids presented by Plaintiff were rejected and Technical Associates, which was recommended by Jennings, was awarded the engineering work despite not submitting the lowest estimate, and Aguero told Plaintiff that he received preferential treatment because of politics.

## 2.    Whistle-Blowing Activity

By Memorandums dated July 7 and 13, 2000, Plaintiff warned that Jennings and/or Bowser were involved in bid rigging.  Kramer acknowledged that Plaintiff made the same allegations verbally.

## 3.    Adverse Employment Action

The Board suspended Plaintiff from employment two months after he presented the Memorandums regarding big rigging to Kramer and DeVincenzi.  Six months after he presented the Memorandums, the Board terminated Plaintiff from employment.

-25-

### 4.      Causal Connection

Plaintiff has presented evidence that supports his claim that he was suspended and terminated from employment in retaliation for making allegations of bid rigging.  It is undisputed that other employees made confirming orders, ostensibly some more significant than Plaintiff's, and they were not suspended and/or terminated from employment.  Indeed, Kramer testified that confirming orders happened "[a]t the East Orange Board of Ed, a few times a week."  Further, Kramer stated that other employees had as many confirming orders as Plaintiff.  The Board did not dispute that thirty other employees have been reprimanded for making confirming orders.

Further, according to Kramer, the Board failed to follow its own policies and procedures when it terminated Plaintiff rather than disciplining him and placing him on probation.

And, the proximity in time between Plaintiff's allegations and the Board's decision to suspend him (i.e., 2 months) creates a presumption, albeit rebuttable, that the first event triggered the next.

The chronology of events likewise creates a question for the fact finder to resolve.  Kramer testified that he fielded a call from a vendor and recalled he said "now that James Scott isn't there, and you don't pay anybody without purchase orders, how am I going to get paid?"  Ostensibly, Plaintiff was no longer there because he was suspended from employment, which happened during the September 5, 2000 Board meeting.  Thus, it is circumspect that Plaintiff was suspended for making confirming orders when Kramer and, thus, the Board learned of Plaintiff's confirming orders after he was suspended.  Interestingly, Kramer recalled that after September 5, 2000 someone, he could not recall who, requested that he provide information regarding Plaintiff's confirming orders.  Thus, a fact finder must determine whether Plaintiff was suspended and terminated from employment in retaliation for making statements about bid rigging.  The CEPA claim against the

Board is not dismissed.

The CEPA claim against Jennings is dismissed with prejudice because, as stated in the § 1983 section above, Jennings did not suspend or terminate Plaintiff from employment or take any adverse employment action against Plaintiff.

### E.    Conversion

"The gravamen of the tort of conversion consists of the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights." Commercial Insurance Co. of Newark v. Apgar, 111 N.J. Super. 108, 114-15 (Law Div. 1970) (citing McGlynn v. Schultz, 90 N.J. Super. 505 (Ch. Div. 1966) (aff'd 95 N.J. Super. 412 (App. Div. 1967), cert. den. 50 N.J. 409 (1967)).  Conversion only occurs after the owner demands delivery of its goods from the defendant, who in turn refuses this request.  Mueller v. Technical Devices Corp., 8 N.J. 201, 207-08 (1951).  The owner has the burden of establishing both the demand and refusal.  Mueller, 8 N.J. at 208.

In the instant matter, the Board is entitled to summary judgment of Plaintiff's claim for conversion because there is no credible evidence that the Board "refused to allow Plaintiff to have access to his personal belongings after his employment was terminated." (Compl. 13.)  The record is replete with evidence that the Board's counsel identified the items belonging to Plaintiff within a reasonable time, and on several occasions, it offered Plaintiff the opportunity to retrieve them. There is no need to recount the communications between Plaintiff's counsel and the Board's counsel regarding Plaintiff's personal property.  See supra.

It is necessary, however, to address the argument asserted by Plaintiff that "Defendants stated that they would only return the items, after holding them for a year, if Plaintiff would dismiss his conversion claim." (Opp'n Br. 22.)  By letter dated February 11, 2002, Plaintiff's counsel stated to

the Board's counsel, "[a]fter discussing the matter, you reiterated that you were not going to return Mr. Scott's personal items unless the Conversion Claim was withdrawn."  (Shaffer Letter dated February 11, 2002.)

By letter dated February 12, 2002, the Board's counsel refuted the February 11, 2002 letter. She began with, "I am in receipt of your letter dated February 11, 2002 which improperly reflects our conversation.  Please let me clarify the Board's position."  She explained:

> I am now in receipt of Mr. Scott's list of the items which he claims were left behind in his office.  I am in the process of reviewing this list and identifying items which are his and those which are the Board's.  Since the items seem to be intermingled, it needs to be properly separated.  Upon completion of this process, I will return items which belong to Mr. Scott.  At no time did I state that I would not return items which are, in fact, Mr. Scott's personal belongings.
>
> Although I would expect that your client will dismiss the conversion claim, you indicated to me that Mr. Scott has suffered damages. What damages, if any, Mr. Scott has suffered is unclear.  Regardless, Mr. Scott should dismiss this claim since the Board is acting in good faith and so should Mr. Scott.
>
> I trust this clarifies the Board's position.

(Schwartz, Esq. Letter dated February 12, 2002.)

Not two months later, by letter dated April 5, 2002[4], the Board's counsel provided to Plaintiff's counsel a list of the personal items found in Plaintiff's office and invited Plaintiff to arrange for procurement of such items.  (Board's 56.1 Statement ¶ 49; Jennings' 56.1 Statement ¶ 45.)  Neither Plaintiff nor his counsel responded to the April 5, 2002 letter.  (Board's 56.1 Statement ¶ 50.)  Seventeen months later, by letter dated September 26, 2003, Plaintiff's counsel alleged that

---

[4]  Two months is reasonable considering fifty-two (52) items were listed and Plaintiff's property had to be separated from the Board's.  Further, the Board may have spent time searching for items that "Mr. Scott claims were left behind by him, which were not."  (Schwartz Letter dated April 5, 2002.)

"Mr. Scott's personal property is still being held by Defendants."  (Board's 56.1 Statement ¶ 51; Jennings' 56.1 Statement ¶ 46.).  Based upon this evidence alone, it is unseemly to make a claim for conversion.

The saga does not end here, however.  By letter dated October 1, 2003, the Board's counsel responded to the September 26, 2003 letter by explaining efforts made to contact him regarding Plaintiff's personal items and Plaintiff's counsel's failure to respond to same.  (Board's 56.1 Statement ¶ 52; Jennings' 56.1 Statement ¶ 48.)  Said letter included the "letter of April 5, 2002, delineating the personal items which, at that time, were in the Board's possession." (Jennings' 56.1 Statement ¶ 47.)  The Board's counsel requested that "plaintiff dismiss [the conversion] count of his Complaint." (Jennings' 56.1 Statement ¶ 48.)

By letter dated October 17, 2003, the Board's counsel informed Plaintiff's counsel that "Mr. Scott's [personal] items he alleges to have been converted by the Board are available for pick up at my office." (Board's 56.1 Statement ¶ 53; Jennings' 56.1 Statement ¶ 49.)  By letter dated November 3, 2003, the Board's counsel confirmed with Plaintiff's counsel his consent for the Board's counsel to contact Plaintiff directly regarding arrangements to retrieve his personal items. (Board's 56.1 Statement ¶ 54; Jennings' 56.1 Statement ¶ 50.)

Finally, on November 7, 2003, Plaintiff retrieved his personal items from the Board's counsel's law office.  (Board's 56.1 Statement ¶ 56; Jennings' 56.1 Statement ¶ 52.)  On that date, Plaintiff executed an Acknowledgment of Receipt of Personal Items.  (Board's 56.1 Statement ¶ 57.)

Considering the enormous effort made by the Board's counsel to return Plaintiff's personal property, which was mostly disregarded, and that Plaintiff cannot prove that the Board refused to return his personal property, the claim for conversion cannot withstand summary judgment scrutiny. The claim for conversion against the Board is dismissed with prejudice.

Jennings is entitled to summary judgment of Plaintiff's claim for conversion because there is not a shred of evidence that Jennings ever exercised dominion or control over Plaintiff's personal property. Indeed, Jennings' and Plaintiff's counsel never communicated about Plaintiff's personal property for this reason. Plaintiff blithely lumps Defendants together in his claim for conversion. The claim for conversion against Jennings is dismissed with prejudice.

### F.    Rule 11 Sanctions

Federal Rule of Civil Procedure 11 provides:

> A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Fed. R. Civ. P. 11(c)(1)(A). Although the 21-day period starts with service of the motion for sanctions, the intention of the Rule is that counsel will give "informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion." Fed. R. Civ. P. 11, Advisory Committee Notes to 1993 Amendment. See Moore's Federal Practice, Civil § 11.22(1)(b). Because the Rule anticipates that counsel will warn its adversary and attempt to persuade it to dismiss its frivolous claim prior to serving a copy of the motion, the communications that precede service of the motion do not satisfy the safe harbor prerequisite to filing the motion. Farris v. County of Camden, 61 F. Supp. 2d 307, 332 (D.N.J. 1999); Roth v. Green, 2006 U.S. App. LEXIS 26923, No. 05-1129, 05-1272 (10th Cir. 2006) ("nothing in subsection (c)(1)(A) suggests that a letter addressed to the alleged offending party will suffice to satisfy the safe harbor requirements."); Barber v. Miller, 146 F.3d 707, 710 (9th Cir.

-30-

1998) (motion denied because not served upon appellant 21 days before filing); <u>Piantone v. Sweeney</u>, 1995 U.S. Dist. LEXIS 17358, No. Civ. A. 94-7007 (E.D. Pa. 1995) (repeated notice given by letter is not sufficient)).  Thus, unless counsel serves a copy of the Rule 11 motion on its adversary and waits 21 days from the date of service before filing the motion, the motion must be denied.

The Board's Motion for Sanctions and Counsel Fees[5] is denied because the Board failed to serve a copy of the Motion on Plaintiff's counsel before it filed the Motion with the Court.  The letter, dated May 2, 2006, in which Plaintiff's counsel warned "that if the [conversion] claim was not withdrawn, the Board would seek sanctions and fees from the Court" does not satisfy the safe harbor prerequisite.  Although the Board's counsel advised Plaintiff's counsel on numerous occasions that Plaintiff's conversion claim is devoid of any basis in law or fact and has requested repeatedly that Plaintiff withdraw his conversion claim, these actions do not satisfy the safe harbor prerequisite.  Thus, the Motion for Sanctions and Counsel Fees is denied.

### G.	CONCLUSION

For the foregoing reasons, the Board's Motion for Summary Judgment is granted in part and denied in part; Jennings' Motion is granted in its entirety; and the Board's Motion for Sanctions and Counsel Fees is denied in its entirety.

**S/Susan D. Wigenton, U.S.D.J.**

---

[5] The Board requested that the Court order Plaintiff and/or his counsel to reimburse the Board in an amount equal to its reasonable costs and counsel fees incurred in defending against the conversion claim from the inception of this litigation, including the costs and fees associated with filing this Motion.